Judge Richard L. HINTON, Appellant,

v.

JUDICIAL RETIREMENT AND REMOVAL COMMISSION, Appellee.

No. 92–SC–636–RR.

Supreme Court of Kentucky.

March 18, 1993.

As Modified on Denial of Rehearing July 1, 1993.*

John R. Leathers, Greg E. Mitchell, Robert M. Goldberg, Frost & Jacobs, Lexington, for appellant.

George F. Rabe, James D. Lawson, Lexington, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a final order of the Judicial Retirement and Removal Commission finding Mason Circuit Judge Richard L. Hinton guilty of violating SCR 4.300, Canon 3 A(3) of the Code of Judicial Responsibility. The Commission ordered a public censure.

The question presented is whether the record supports the finding that the judge acted in an undignified, discourteous or impatient manner toward Lexington attorney Jerry Anderson.

Judge Hinton was presiding over the murder trial of Patrick S. Huron in 1991. The homicide arose from a fight and a shooting at a Mason County bar in which a woman bystander was killed. Virgil Dermon, his wife Shirley and their son Troy were present at the bar when the shooting occurred. The fatal bullet was fired from Virgil Dermon's gun which he had brought to the bar. He had given a statement to police in which he admitted he had fired the gun that night into the floor at the bar. Several months prior to the murder trial, the Dermons retained Lexington attorney Anderson to protect their rights in regard to the incident. Before trial, Anderson called the Commonwealth Attorney and defense counsel to inform them that he would be representing the Dermons as witnesses and that Virgil would be claiming a Fifth Amendment right not to testify at trial and that his wife Shirley would be claiming a spousal privilege not to testify.

Late on the first day of trial, Judge Hinton was informed by the prosecutor that some witnesses were going to refuse to testify on the grounds that it might incriminate them. Judge Hinton then examined proposed witness Shirley Dermon, who he advised to be present the next morning prepared to testify. Judge Hinton also examined proposed witness Virgil Dermon and advised Dermon that he should testify as to what happened up to Midnight at the bar, and then he would consider witness immunity on a question-by-question basis.

Lawyer Anderson arrived the next morning shortly before 11 o'clock and in the midst of a 10–minute recess. When Anderson was advised that his client Shirley had already been jailed for contempt, he approached Judge Hinton in the courthouse county law library. Judge Hinton refused to discuss the matter at that time.

Judge Hinton returned to the courtroom and a trial resumed with a bench confer-

ence with trial counsel concerning the testimony of Virgil who was to be the next witness. During the bench conference, Anderson approached the bench and a verbal exchange occurred between the judge and Anderson. At the conclusion of the less than 2–minute exchange, the trial judge held Anderson in contempt and sentenced him to three days in jail. Anderson was released from jail shortly before 3 p.m.

Virgil Dermon did not testify at the January trial which ended when a mistrial was declared because the jury would not agree on a verdict. At the second trial, Virgil testified under a grant of immunity, and Huron was eventually convicted of reckless homicide and sentenced to five years imprisonment.

Lawyer Anderson made a formal complaint before the Judicial Retirement and Removal Commission on April 25, 1991. After a preliminary investigation, the Commission charged Judge Hinton with violating SCR 4.020(1)(b)(i), SCR 4.020(1)(b)(v) and SCR 4.300, Canons 1, 2 A and 3 A(2, 3 & 4) of the Code of Judicial Conduct. After considering the evidence, the Commission dismissed charges relating to alleged violations of Canons 1, 2, 3 A(2) and 3 A(4). The Commission unanimously found that Judge Hinton manifested a predetermination to ignore Anderson's legal representation of the witnesses and that he summarily jailed Anderson who was only trying to represent his clients and make a record. The Commission concluded that the only violation was the summary jailing of Anderson for contempt and that the judge was required to be patient, dignified and courteous in his treatment of lawyers. The Commission states in its brief that no violation would have been found under the circumstances if it were not for the summary jailing of Anderson.

■ The standard of review on appeals from the Judicial Retirement and Removal Commission is that the Supreme Court must accept the findings and conclusions of the commission unless they are clearly erroneous; that is to say, unreasonable. *Wilson v. Judicial Retirement and Removal Commission*, Ky., 673 S.W.2d 426 (1984); SCR 4.290.

■ The record does not support a finding by the Commission that Judge Hinton acted in an undignified, discourteous or impatient manner toward Anderson in such a degree as to require public censure. The findings and conclusions of the Commission were clearly erroneous.

It was Anderson who failed to attend a hearing conducted by Judge Hinton which was intended to protect the rights of the witnesses who were clients of Anderson. Judge Hinton was not required to relax the local rules of conduct so as to permit Anderson to participate in the hearing regarding the testimony. It is the obligation of counsel to be prepared on all local and general rules. Judge Hinton did not breach any duty when he refused to permit Anderson to make an *ex parte* argument during the trial recess on the morning of the second day of trial. The trial judge has both the duty and the discretion to control the courtroom. The record here does not clearly or convincingly demonstrate that Judge Hinton violated any of the judicial standards of conduct.

Anderson interrupted a colloquy between trial counsel and the trial judge. A review of part of the exchange between Hinton and Anderson indicates that it was Anderson who persisted.

Mr. Anderson: That's fine. I want the record to be clear.

The Court: It is clear, but if you continue I will hold you in contempt of court.

Mr. Anderson: That's fine. Are you telling me to leave the courtroom?

The Court: I am.

Mr. Anderson: Okay.

The Court: Not to leave the courtroom, but leave the bench; you are not a party to this trial.

Mr. Anderson: And I cannot advise my client?

The Court: You have had much opportunity to do that; you have already done it.

Mr. Anderson: I can't advise my client?

The Court: You may leave the court area—or leave the bar.

Mr. Anderson: Okay. I will have to advise my client.

The Court: Do you hear me?

Mr. Anderson: I do. I am going to leave but I need to advise my client not to answer any questions.

The Court: You have already done that.

Mr. Anderson: —Unless I am here. No.

The Court: Go.

After an exchange of nine more comments, the trial judge advised Anderson that he was in contempt of court and sentenced him to three days in jail.

■ It is the responsibility of the trial judge to maintain control of the courtroom and sometimes that must be done by a legitimate exercise of the contempt power.

The decision by Judge Hinton not to permit Anderson to appear on behalf of the witnesses after Anderson had failed to comply with local rules of procedure by filing an entry of appearance or pretrial motion was not arbitrary. His subsequent decision to hold Anderson in contempt was the result of judicial discretion; there was no abuse of discretion. The proper remedy for correcting an alleged abuse of discretion is by appeal. Anderson, as a nonparty contemner, could have sought review by means of appeal but he did not do so.

Although there are no Kentucky cases directly on point, the Oregon case of *In re Conduct of Gustafson*, 305 Or. 655, 756 P.2d 21 (1988) indicates that public censure is appropriate where a judge is guilty of repeated instances of willful misconduct. Here there is nothing in the record to indicate that this is anything other than an isolated incident provoked by persistent counsel. There is no record of prior wilful misconduct of any kind by Judge Hinton.

The Commission did not find the trial judge had engaged in a pattern of impatient, undignified or discourteous conduct so as to merit public censure. *Cf. In re Rasmussen*, 43 Cal.3d 536, 236 Cal.Rptr. 152, 734 P.2d 988 (1987). We are not persuaded by the one case the Commission cites, *In re Sheppard*, 815 S.W.2d 917 (Tex. Spec.Ct.Rev.1991), which disciplined a judge by means of public censure for an

isolated incident which occurred outside the courtroom. The audio tapes in this case reveal that the exchange between Anderson and Judge Hinton never went beyond normal conversational tone. In view of the fact that this is the first report of alleged misconduct, we believe that public reprimand is an inappropriate sanction.

A review of the record on appeal indicates that the decision of the Commission was based on findings and conclusions which were clearly erroneous or unreasonable under all the circumstances, and the penalty of public censure was unreasonable. Pursuant to the authority vested in the Supreme Court of Kentucky upon review of a decision of the Judicial Retirement and Removal Commission as set out in SCR 4.290(5), the order of the Commission is set aside.

STEPHENS, C.J., and COMBS, REYNOLDS and SPAIN, JJ., concur.

LEIBSON, J., dissents by separate opinion in which LAMBERT, J., joins.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

In 1975, the Judicial Retirement and Removal Commission was constitutionally created as part of the new Judicial Article as part of meaningful court reform. Kentucky Constitution Sec. 121. The Commission was empowered to hear complaints against judges, find the facts, and decide appropriate discipline. Its fact-finding and decision-making is final subject to judicial review by the Supreme Court for reversible error using the same standard for review that applies to review of the final decision of a trial court: "on appeal this court must accept the findings and conclusions of the commission unless they are clearly erroneous." *Wilson v. Judicial Retirement & Removal Comm'n*, Ky., 673 S.W.2d 426, 427–28 (1984).

While the concept of what is "clearly erroneous" is necessarily incapable of mathematical precision, it is properly articulated in Bertelsman & Philipps, *Kentucky Practice*, 4th ed., Rule 52.01, p. 231, as follows:

"[T]he Kentucky test is that a finding is 'clearly erroneous' only if there is no substantial evidence in the record to support it, or, the scope of review of the appellate court is the same as if it were reviewing the factual findings of a properly instructed jury."  .

In this case the Commission has concluded unanimously that Judge Hinton "violated Canon 3 A(3) of the Code of Judicial Conduct," which provides in pertinent part:

"A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity...."

There is ample evidence as stated in the "Findings of Fact, Conclusions of Law and Final Order" of the Commission to justify both the Commission's conclusions and its final order adjudicating "Judge Hinton be PUBLICLY CENSURED."

This is not a lawyer's disciplinary proceeding wherein the responsibility for decision-making rests with this Court and the function of the Bar Association is as this Court's agent to gather evidence and make a recommendation. We have neither the right nor the power to reverse the Commission simply because a majority of this Court does not consider Judge Hinton's conduct merits public censure. When we do so, we have preempted the Commission's authority, we have frustrated the intent of the new Judicial Article, and we will undermine public confidence in the judiciary by rendering the Commission a toothless tiger.

The record of what transpired in Judge Hinton's court is more than ample to support the Commission's findings and its decision.

With apologies to the reader, to explain the Commission's decision it is necessary to quote in full the factual background as correctly stated in the Commission's report:

## III

## BACKGROUND AND EVIDENCE

1. The events involving Judge Hinton and Jerry Anderson occurred during the course of the murder trial of Patrick Huron. The trial was conducted on January 22 and 23, 1991 in the Mason Circuit Court. The murder charge against Huron arose out of a homicide that occurred in a bar in Mason County. Mr. Anderson represented three witnesses who were subpoenaed to testify in the murder prosecution of Patrick Huron; the witnesses were Virgil Dermon, Shirley Dermon, and Troy Dermon.

2. On some unspecified date prior to trial, Mr. Anderson called the Commonwealth Attorney, Woodson Wood, to inform him that Virgil Dermon would exercise his Privilege Against Self–Incrimination and refuse to testify in the Huron trial. He further informed Wood (1) that Shirley Dermon, wife of Virgil Dermon, would invoke a spousal privilege not to testify against her husband and (2) that he would be representing Troy Dermon, son of Virgil and Shirley. On some unspecified date prior to trial, Mr. Anderson also called by phone Dale Horner, defense counsel for Huron, and informed him of what his clients' legal positions were with respect to the upcoming trial.

3. Anderson was not present in the Mason Circuit Court on the first day of the murder trial of Patrick Huron. Near the end of the first day of the trial, the prosecuting and defense attorneys (Mr. Wood and Mr. Horner) had a side bar conference with Judge Hinton concerning the schedule for prospective witnesses. Mr. Wood informed Judge Hinton that the Dermons were going to lodge objections to giving testimony. The following record of that conference reveals Judge Hinton's reaction (Stipulation No. 2, Transcript p. 160–162):

THE COURT: Well, that is all right; I don't care how much anybody objects; I am talking about time, and getting rid of these witnesses. Why can't we get rid of them today. Are they here?

MR. WOOD: They are here. I don't know whether their lawyer is here or not.

*THE COURT:* Well, I don't know that they are entitled to a lawyer. They are not on trial here.

*MR. WOOD:* No, sir.

*THE COURT:* Well, where do they get [sic] the lawyer before you testify; I have never heard of such a thing; maybe in some of these congressional hearings; I have never heard of that in a court of law.

*MR. WOOD:* They have talked to a lawyer, Judge.

*THE COURT:* I don't care how many lawyers they have talked to; they are going to talk to me about testimony, not some lawyer.

*MR. WOOD:* Judge, I understand—

*THE COURT:* And I am not going to listen to any lawyer; I have got enough. I have got two already; certainly I don't want more.

*MR. WOOD:* I understand that, but I just wanted to make the Court aware that they are going to say, we refuse to testify on the grounds—

*THE COURT:* Well, now, they may do that, but I don't want any lawyer standing in here telling them what to do; in fact, I am not going to have him. Okay.

4. At approximately 5:00 p.m., after the jury was adjourned, Judge Hinton held a hearing and Mr. and Mrs. Dermon appeared without counsel. The Court first interrogated Mrs. Dermon as follows (Transcript, p. 185):

Q. What is your name?

A. Shirley Dermon.

Q. I understand that you have been subpoenaed in this case as a witness for the Commonwealth?

A. Yes, sir.

Q. I understand you say you won't testify on the grounds that it might incriminate you?

A. I plan to take the Fifth.

Q. You are not taking the Fifth in this case, because there is no evidence against you; you be here in the morning at ten o'clock, and you will testify, is that clear?

A. Yes, sir.

*THE COURT:* Very good.

*SHIRLEY DERMON:* Am I excused?

*THE COURT:* Yes, you are.

The Court next interrogated Mr. Dermon as follows (Transcript, p. 187, 188, 189):

Q. You are Virgil Dermon.

A. That's D-e-r-m-o-n, sir.

Q. Mr. Dermon, I understand that you have been subpoenaed by the Commonwealth as a witness—

*MR. WOOD:* No, the defense, as a witness.

*THE COURT:* Oh, by the defense. Well, was his wife—

*MR. WOOD:* She was the Commonwealth.

*THE COURT:* She was for the Commonwealth, but you are for the defense.

Q. I understand that you are going to refuse to testify on the grounds that your testimony might incriminate you; is that true?

A. I don't know; my lawyer told me to take the Fifth until he got here, sir.

Q. Well, I am not concerned about your lawyer; I am concerned with whether, what you might say might incriminate you in any way; would it?

A. I don't know, sir.

Q. You don't know?

A. I am just doing what my lawyer told me to do, sir.

Q. Well, I am not concerned with what your lawyer said; for certain you will testify as to what happened before midnight; in other words, there were quite a few events there at the River Bend Bar which began in the early afternoon and continued until midnight; for certain, you will testify as to what happened up to midnight, and then we will consider it on a question by question basis. Very good, you be here at ten o'clock in the morning— but, you won't be ready for him, then, will you?

*MR. HORNER:* No, no.

THE COURT: He wouldn't have to be here before lunch, would he?

MR. WOOD: I would say, 11:00, Judge.

THE COURT: You be here at eleven o'clock in the morning.

5. The Dermons informed Anderson that they would probably be called to testify during the morning of the second day of the trial (January 23). Mr. Anderson had a court appearance in Lexington on that day and could not arrive at the Mason County Courthouse until mid-morning. He advised his clients to take the Fifth Amendment if called and that he would be there as soon as he could.

Mr. Wood called Mrs. Dermon to the stand, where the following took place (Transcript p. 193, 194):

MR. WOOD: Mrs. Virgil Dermon. Mrs. Dermon, you will have to take the stand.

SHIRLEY DERMON: I am taking the Fifth.

MR. WOOD: I understand, but the judge has ruled that you will have to testify.

SHIRLEY DERMON: Without my lawyer?

MR. WOOD: It is my understanding of his ruling.

THE COURT: That ruling was made yesterday afternoon, be sworn, please.

SHIRLEY DERMON: I take the Fifth.

MR. WOOD: It's up to you.

THE COURT: You refuse?

SHIRLEY DERMON: Yes, because my lawyer—

THE COURT: Come forward, please. I find you to be in contempt of court. I sentence you to the Mason County Jail until you have satisfied the ruling of the Court.

SHIRLEY DERMON: Yes, sir.

THE COURT: Take charge of her, Mr. Sheriff. Let me inform you of this, Mrs. Dermon. There is no charge against you; there is no basis for claiming Fifth Amendment rights in your case, and you know it.

6. Upon arrival, Mr. Anderson was advised that Shirley Dermon had already been called as a witness and had been committed to jail by Judge Hinton for refusing to give testimony. Mr. Anderson attempted to approach Judge Hinton during a recess of the trial. Judge Hinton was seated at a table in the county law library (which is in a building adjoining the courthouse) at this time. Mr. Anderson stated that he introduced himself to Judge Hinton and stated that his client Virgil Dermon would be invoking his Fifth Amendment Privilege Against Self–Incrimination. He stated that Judge Hinton stood up and, without looking at him, said, 'we'll see about that.' Judge Hinton then left the library and returned to the courtroom without further comment. Judge Hinton said about this encounter that he recalled encountering Mr. Anderson in the library, that he did not have time to discuss the matter with him since the recess was nearly over, and that he recalled telling Mr. Anderson that he was giving his clients some bad advice. Judge Hinton denied being discourteous to Anderson.

7. Following recess of the trial, Virgil Dermon was called to testify. Mr. Anderson entered the courtroom with Dermon, his client, and both men approached the bench. A discussion between Mr. Anderson and Judge Hinton ensued as follows: (Transcript p. 229, 230, 231):

(At which said time, JERRY ANDERSON, Attorney at Law, counsel on behalf of the witness, VIRGIL 'BUDDY DERMON' approached the bench, and the following record was made:)

MR. ANDERSON: Excuse me.

THE COURT: I don't know that you are even entitled to be here, sir. This is not a congressional hearing; this is a Court of law.

MR. ANDERSON: I am an attorney for a witness, Your Honor.

THE COURT: I don't know that witnesses are entitled to attorneys.

MR. ANDERSON: Under the Fifth Amendment, they are entitled to an attorney.

THE COURT: Well, I don't know that they are. You may give them advice, but you may not appear here now.

MR. ANDERSON: They are entitled to representation.

THE COURT: I said you may not appear, and you may be excused.

MR. ANDERSON: I just want the record to be clear.

THE COURT: Did you hear me?

MR. ANDERSON: That's fine. I want the record to be clear.

THE COURT: It is clear, but if you continue, I will hold you in contempt of court.

MR. ANDERSON: That's fine. Are you telling me to leave the courtroom?

THE COURT: I am.

MR. ANDERSON: Okay.

THE COURT: Not leave the courtroom, but leave the bench; you are not a party to this trial.

MR. ANDERSON: And I cannot advise my client?

THE COURT: You have had much opportunity to do that; you have already done it.

MR. ANDERSON: I can't advise my client?

THE COURT: You may leave the court area—or leave the bar.

MR. ANDERSON: Okay. I will have to advise my client.

THE COURT: Do you hear me?

MR. ANDERSON: I do. I am going to leave, but I need to advise my client not to answer any questions—

THE COURT: You have already done that.

MR. ANDERSON: —unless I am here. No.

THE COURT: Go.

MR. ANDERSON: Okay. Will this go on the record?

THE COURT: I said for you to leave, sir.

MR. ANDERSON: I know, but it needs to go on the record, Your Honor.

THE COURT: Did you hear me?

MR. ANDERSON: We are making a record.

THE COURT: You are putting nothing on the record.

MR. ANDERSON: This is on [sic] going on the record, Your Honor.

THE COURT: If you persist, I will hold you in contempt.

MR. ANDERSON: The court reporter—it's on the record, Your Honor.

THE COURT: Mr. Anderson, I hold you in contempt of court; I sentence you to three days in jail. Take charge of him, sir.

THE COURT: (Addressing Virgil "Buddy" Dermon.) Now, do you wish to be sworn?

WITNESS–VIRGIL "BUDDY" DERMON: I don't—yes, sir.

THE COURT: Very good.

8. Immediately after Mr. Anderson was removed from the courtroom, Mr. Dermon was called by the Court to testify as follows: (Transcript p. 232–233):

Q. State your name.

A. Virgil Dermon.

Q. And where do you live?

A. Charleston Bottoms.

Q. I am sorry; you are going to have to speak up. And how are you employed?

A. With Browning Manufacturing, and self-employed, too, sir.

Q. Mr. Dermon, if we could get that microphone a little bit closer, I believe that maybe we can all hear you.

Q. On June 29th of 1980, on Friday afternoon, did you arrive at the River Bend Bar?

A. Sir, my lawyer told me to take the Fifth, sir.

Q. As to that question.

A. He told me to take the Fifth Amendment, without his presence, sir, I don't know. I am confused. I am just doing what he told me to do, sir.

THE COURT: Mr. Dermon?

MR. DERMON: Yes, sir.

*THE COURT:* Answer the question.

Q. Do you want me to repeat the question.

A. Yes, sir.

Q. On June 29th, 1990, I mean, 1989–1990, now I am confused, in the early hours of the afternoon, did you arrive at the River Bend Bar?

A. Sir, I am really confused, because my lawyer told me—

*THE COURT:* Mr. Dermon, are you going to answer the question?

*MR. DERMON:* What am I supposed to do, sir?

*THE COURT:* I hold you in contempt of Court, Mr. Dermon, and I sentence you to the Mason County Jail until you have purged yourself of contempt. Take charge of him, Mr. Sheriff.

9. Next, Troy Dermon was called, as follows (Transcript p. 233, 234):

### TROY DERMON

[Sic] called as a witness on behalf of the DEFENSE, and being first duly sworn by the Clerk, testified as follows:

### DIRECT EXAMINATION

BY MR. HORNER:

*MR. TROY DERMON:* Sir, I take the Fifth.

*THE COURT:* On what grounds?

*MR. TROY DERMON:* I want my lawyer present.

*THE COURT:* Are you going to be sworn?

*MR. TROY DERMON:* I was—

*THE COURT:* Did you swear him?

*THE CLERK:* Yes, sir.

*MR. TROY DERMON:* I was told to take the Fifth, and that is what I am taking.

*THE COURT:* You were told to.

*MR. TROY DERMON:* I am taking the Fifth.

*THE COURT:* If you don't answer the questions asked of you, Mr. Dermon, I will hold you in contempt of court and order you placed in the Mason County Jail.

*MR. TROY DERMON:* Do it.

*THE COURT:* Sir?

*MR. TROY DERMON:* That's fine.

*THE COURT:* Very good. I hold you in contempt of Court, and I sentence you to the Mason County Jail until you purge yourself of contempt. Take charge of him, Mr. Sheriff.

10. Later in the day (the second day of trial), Judge Hinton met with the prosecuting and defense attorneys (Mr. Wood and Mr. Horner) for a discussion of the matter involving the testimony of the witnesses who had been jailed for contempt. Mr. Horner informed Judge Hinton that he had found a leading case concerning procedures required when a witness invokes his or her Fifth Amendment Privilege. He asked Judge Hinton to review the case and to recall Shirley Dermon. Both Shirley Dermon and Troy Dermon were released from jail and recalled as witnesses; both testified. It was agreed that Virgil Dermon had a proper claim of possible self-incrimination; he was released from jail, purged of charges of contempt of court, and was not recalled as a witness. Mr. Anderson was released from jail after serving about four hours of incarceration."

The Removal Commission found that Judge Hinton had predetermined that he would not allow lawyer Jerry Anderson to be heard on behalf of the witnesses whom Anderson represented. To prevent it:

1) For no justifiable reason, knowing full well that the witnesses wanted their lawyer there to represent them, at the end of the first day of trial Judge Hinton conducted a hearing on the witnesses' right to refuse to testify in his absence.

2) On the next day, Judge Hinton refused to talk to the lawyer when he went to the library while the court was in recess, as suggested by the Commonwealth Attorney, to request to be heard.

3) Judge Hinton then convened court and refused to hear the lawyer (or permit him to make a record), stating in effect that the lawyer had no right to be heard because he

only represented *witnesses* (not parties), and court was in session.

4) Finally, Judge Hinton put the lawyer in jail for trying, faithfully and respectfully, to represent his clients.

The record fully supports the conclusion of the Commission that "Judge Hinton ... did not accord Mr. Anderson the patience, dignity and courtesy to which he was entitled in attempting to represent his clients," and the Commission's decision that Judge Hinton's conduct was so significantly willful and pervasive as to violate Canon 3 A(3) and to justify "PUBLIC CENSURE." Judge Hinton's conduct in jailing an attorney for contempt in the circumstances presented was so arbitrary and abusive that it well may have merited a more severe penalty than that which the Commission imposed, but certainly the record does not justify overruling the Commission and exonerating Judge Hinton.

Our Court should affirm the Commission's decision.

LAMBERT, J., joins this dissent.